**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

CHRISTOPHER JEROME WARE                    CIVIL ACTION NO. 14-2214

VERSUS                                     JUDGE S. MAURICE HICKS, JR.

LOUISIANA DEPT. OF                         MAGISTRATE JUDGE HORNSBY
CORRECTIONS, ET AL.

**MEMORANDUM RULING**

Before this Court is an Renewed Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction (Record Document 57) filed by Plaintiff, Christopher Ware ("Ware"). Defendants, Louisiana Department of Corrections ("DOC") and Secretary James LeBlanc ("Secretary LeBlanc"), filed a Memorandum in Opposition (Record Document 62). The trial on the merits was expedited and the bench trial was held February 1-3, 2016. See Record Documents 98, 100, 101. For the reasons set forth in this memorandum, Ware's Renewed Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED** and all claims set forth in Ware's complaint are **DISMISSED WITH PREJUDICE**.

**BACKGROUND**

Ware is a Louisiana DOC inmate who recently began practicing the religion of Rastafarianism. He is currently being housed under a DOC contract with the Bossier Medium Security Jail in Plain Dealing, Louisiana, which is operated by the Sheriff of Bossier Parish. See Trial Transcript, p. 130.[1] Ware was convicted in 2014 on two counts of sexual battery. See Document 86 at ¶4. During the period prior to his convictions, he was held in

---

[1] The Trial Transcript can be found in the record as Record Documents 106-108.

another Parish facility, the Caddo Correctional Center ("CCC") in Caddo Parish, operated by the Sheriff of Caddo Parish.  See id. at ¶ 10.

In approximately late 2011 or early 2012, Ware became a practitioner of the Rastafari faith, and as an exercise of his faith, he took what he describes as the "Vow of the Nazarite," one aspect of which requires him not to cut or style the hair on his head.  See Trial Transcript, p. 136.  As a result of Ware's adoption of the Nazarite vow in connection with his Rastafari religious exercise, his hair has grown and continues to grow into long dreadlocks.  He began growing his dreadlocks while housed at CCC.  See id.

Because of the length of his sentence, Ware was ineligible to serve the remainder of his state sentence at CCC (or any other parish facility), and was required to be transferred into the physical custody of the Louisiana DOC, for placement in a DOC-run prison.  See Record Document 86, at ¶ 8.  DOC's grooming policies forbid male inmates from wearing their hair longer than their shirt collars in the back, the tops of the ears on the sides, and the eyebrows in the front, and forbid the wearing of dreadlocks of any length.  See Record Document 86 at ¶ 21.  DOC's intake policies require that all male inmates received into the DOC's physical custody receive – forcibly, if necessary – a closely-cropped haircut with clippers, commonly known as a "buzz cut."  See Joint Trial Ex. 14, §§ 8.C.3.  DOC does not allow for religious exemptions to the application of either its grooming policies or its intake policies.  See Record Document 86 at ¶ 17.

Shortly before pleading guilty on June 30, 2014, Ware instituted this lawsuit against DOC and Secretary LeBlanc, challenging the DOC's grooming and intake policies under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq., and seeking declaratory and injunctive relief to preclude the DOC from enforcing those policies

against him upon his placement into the physical custody of the DOC.  See Record Document 86 at ¶1, 4.

Since filing suit, and at the request of the Court, Ware has been held in parish facilities rather than be received into the physical custody of the DOC, where he would be subject to the intake and grooming policies and be forced to have his dreadlocks removed. See Record Document 86 at ¶ 4.  DOC's primary intake facilities are the Elayn Hunt Correctional Center ("EHCC") for male offenders and Louisiana Correctional Institute for Women ("LCIW") for female offenders in St. Gabriel, La.   See Record Document 86 at ¶ 12.  DOC's general intake regulation (Joint Trial Exhibit 14) (the "Intake Regulation") governs the procedures at both facilities and sets out general "reception procedures" for the intake process, which include in relevant part arranging for the "[p]hotographing" of each offender, ensuring that offenders are "showered," and providing a "shave and/or haircut . . . , if required, to ensure proper identification and to prevent the possible concealment of contraband."  Id., §§ 8.C.2, 8.C.3.

The EHCC intake policy (Joint Trial Exhibit 12) (the "EHCC Intake Policy") provides in relevant part that "all offenders are required to shower and shampoo with anti-lice soap and to undergo a thorough search of their persons and their possessions, and that offenders needing photographs "are required to have haircuts for identification purposes." Id., §§ III.B.2, III.B.4.  The haircut to which offenders at EHCC are subject upon intake is described as a "buzz cut" or "crew cut."  See Joint Trial Exhibit 41, §§ 8.C.3.  Following the "buzz cut," offenders are photographed in forward-facing and both-profile orientations.  See Record Document 86 at ¶ 32.  Once inmates are placed at a permanent institution, ID photographs are updated yearly, at a minimum, and historical photographs are retained

both electronically and in the offenders' files.  See Trial Transcript, p. 373.  Female offenders do not have length restrictions, but instead are prohibited from shaving their head (unless for documented medical reasons), and must style their hair "in such a manner that it is kept out of the face and eyes."  Joint Trial Exhibit 7, § 8.A-B.

## LAW AND ANALYSIS

### I.   Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA")

Ware relies on RLUIPA as the legal basis for the relief he seeks.  RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  RLUIPA and its sister statute, the Religious Freedom Restoration Act of 1993 ("RFRA") were enacted by Congress "in order to provide very broad protection for religious liberty."  Holt v. Hobbs, — U.S. —, 135 S.Ct. 853 (2015), *citing* Burwell v. Hobby Lobby Stores, Inc., — U.S. —, 134 S.Ct. 2751, 2760 (2014).

"Religious exercise" for the purposes of RLUIPA was defined by Congress as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).   Congress also explicitly provided that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."  42 U.S.C. § 2000cc-3(c).

## II.    ANALYSIS

In order to determine whether the DOC policy violates RLUIPA, it is necessary to apply the test that has been set forth by Congress.  RLUIPA, like RFRA, "makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress."  Holt, 135 S.Ct. at 864, citing Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, et al., 546 U.S. 418, 434, 126 S.Ct. 1211, 1222 (2006).  "That test requires the Department not merely to explain why it denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest."  Holt, 135 S.Ct. at 864.  Thus, it is also necessary to look at the policies of other states and then compare those practices to the DOC policy.  Louisiana is not required to automatically defer to what other states are doing in terms of their prisoner grooming policy, "but when so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course."  Holt, 135 S.Ct. at 866.

Ultimately, "RLUIPA requires a court to 'scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context.'" Knight v. Thompson 796 F.3d 1289, 1292 (11th Cir. 2015), citing Holt, 135 S.Ct. at 863.

### A.    Religious Exercise

Ware bears the initial burden of proving that the DOC's grooming policy implicates his religious exercise.  It is undisputed that Ware took the Nazarite vow, becoming a member of the Rastafari faith in late 2011 or early 2012.  The grooming policy of the Louisiana DOC requires that all male inmates may not have hair longer than their shirt

collars in the back, the tops of the ears on the sides, and the eyebrows in the front. Dreadlocks are explicitly forbidden by the policy.  Part of Ware's Rastafari faith is the belief that he may not cut his hair and he forms his hair into dreadlocks after washing his hair by separating, gathering and squeezing groups of hair strands.  The Louisiana DOC has made clear that once Ware goes through the intake procedures at EHCC, his hair will be cut.  It is clear that the required cutting of his hair in compliance with the DOC intake and grooming policies implicates his religious exercise, particularly his belief that he may not cut his hair as part of his Rastafarian Nazarite vow.

### B.    Substantial Burden

Ware also bears the burden of proving that the Department's grooming policy substantially burdens that exercise of religion.  He does not have a choice as to whether to comply with the DOC policy, as it has been made clear that once he goes through intake at EHCC, his hair will be cut.  Ware contends that the forceful cutting of his hair, which is directly in conflict with his religious practice, places a substantial burden on his religious exercise of his chosen aspect of Rastafarian faith.  It is noteworthy that not all Rastafarians take the so-called Nazarite vow, but Ware has indicated that he has taken the vow.

### C.    Louisiana DOC's Grooming Policy

Since Ware has met his initial burden of showing the DOC's intake policy and grooming policy substantially burdens his exercise of religion, the burden shifts to the DOC to show that its grooming policy (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest. See Holt, 135 S.Ct. at 863, *citing* 42 U.S.C. § 2000cc-1(a).  The DOC names a number of compelling government interests in defense of their grooming policy, including:  monitoring

security threat groups, promoting a positive image, contraband control, offender identification, offender hygiene, and prisoner on prisoner violence.   This Court must examine each interest individually and determine whether the DOC, in fact, has a compelling government interest.   Additionally, RLUIPA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' - the particular claimant whose sincere exercise of religion is being substantially burdened."  Holt, 135 S.Ct. at 863, citing Burwell, 134 S.Ct. at 2779..

In the event a compelling government interest has been identified, the DOC must also be able to show that their grooming policy is the least restrictive means by which to achieve that compelling government interest.   The standard for "least restrictive means" established in Burwell is that the government must "show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party."  Burwell, 134 S.Ct. at 2780.

### 1.    Security Threat Group ("STG") Monitoring

The DOC first claims the compelling interest of preventing security threat groups within DOC facilities.   There is a list of security threat groups that is maintained and updated by the DOC.   See Trial Transcript, p. 306.   Jerry Goodwin, David Wade Correctional Center's Warden ("Warden Goodwin"), testified that Rastafarians are not currently listed on the security threat group list.   See id.  He went on to testify that the list is "not an all-inclusive list."  Id.  When questioned about whether he was concerned about Rastafarian group identification, Warden Goodwin replied "in general, no."  Id., p. 308.

Colonel Joel Odom ("Colonel Odom"), the head of the Security Threat Group team with the DOC, was also questioned generally about security threat groups within DOC

facilities.  When asked about whether there are any security threat groups that use long hair as an indicator of affiliation, Colonel Odom replied "no."  Id., p. 547.  When further questioned as to whether there are "any security threat groups that you know of that use dreadlocks as an indicator of affiliation," Colonel Odom again answered "no."  Id.

Colonel Odom spoke of Rastafarians potentially being listed as a security threat group, testifying that "[t]here is some debate whether they're a culture of a black separatist group, but the Louisiana [DOC] has not declared them a STG."  Id.  No specific testimony was provided indicating that Rastafarians are currently at risk of being placed on the STG list in the foreseeable future.

It is clear to this Court from the testimony of Warden Goodwin and Colonel Odom that at this time there is no correlation between the Rastafarian faith, including the wearing of dreadlocks, and any concern surrounding the STGs.  There is no doubt that the DOC has a compelling interest in preventing and controlling STGs within the prisons; however, at this time, inmates who are Rastafarians do not fall within the category of those who are currently being monitored by the DOC.

The DOC must be able to show that the grooming policy ban on dreadlocks is the least restrictive means to achieve the compelling government interest in preventing STGs. In light of the fact that all of the trial testimony indicated that Rastafarians are not currently on any STG lists, this Court is unable to find that the grooming policy's position with regard to inmates wearing dreadlocks as a religious practice has any bearing on its interest in preventing STGs.  For this reason, the grooming policy ban on dreadlocks cannot be the least restrictive means of achieving the goals of identifying, preventing and/or controlling STGs.

### 2.    Promoting a Positive Image

The DOC next contends that the grooming policy is the least restrictive means of promoting a positive image of inmates.  Warden Goodwin was specifically questioned about the DOC wanting to make sure that offenders have a positive image.  He was asked, "What does – do you know what this posted policy means by maintaining a positive image?" and replied:

> It's - - you know, this policy covers grooming in general, it's not just specific to hair - - to hair and beards and things of that nature, it discusses other issues as well.  And you want grooming and appearance standards for offenders that work in the community to promote positive images.  That's like the crew that goes to Haynesville every day I was referencing earlier. Obviously, you wouldn't want to send an offender to represent you that was - - you know, that is covered in offensive tattoos or things like that; maybe he has swastikas on his face or, you know, other things that would be considered offensive by general community standards.  So that's basically what it's referring to.  They have to be neat and presentable.  They have to wear clothes that fit.  They can't wear sagging pants.

See Trial Transcript, p. 389-390.

Warden Goodwin was also specifically asked about dreadlocks and the goal of a positive image for inmates.  He was asked "[i]f Mr. Ware were allowed to maintain his dreadlocks, would he fall - - and he took, you know, baths and washed his hair, like he said he did yesterday, would he be permitted to go into town and promote a positive image?" Id. at 390.  Warden Goodwin replied:

> I don't think the dreadlocks themselves would prohibit him from working on a trusty crew.  You would, obviously, consider the inability to properly search him upon his return.  You might not want to take that risk, and send him out, for those reasons.  But the actual appearance itself or the dreadlocks themselves would not prohibit him from working on that type crew.

Id.  While there is no doubt that the DOC has a compelling interest in promoting a positive image of their inmates in the public, the fact that Ware may be permitted to wear

dreadlocks and work in town shows that the grooming policy is not necessary to further that particular compelling government interest.  There was no evidence provided during trial to establish that Ware wearing his hair in the dreadlocks style would contradict the positive image the DOC wishes to promote on the part of its inmates.  Without any evidence showing dreadlocks casting a negative image on the DOC, this Court finds that the grooming policy ban on dreadlocks is not the least restrictive means by which to achieve the claimed compelling government interest in promoting a positive inmate image.

### 3.    Contraband Control

The third compelling government interest, and the most important one raised by the DOC, is contraband control.  There are any number of ways in which contraband can be introduced or smuggled into a prison facility.  Warden Goodwin testified that there are three basic ways contraband generally enters prison facilities:  (1) in-person visits, (2) staff, and (3) prisoners returning from worksite crews.  See Trial Transcript, pps. 313-314.

There was extensive trial testimony on the direct relationship between contraband control and the grooming policy at issue.  Ware called James Aiken ("Aiken") as an expert witness, and he opined on the issue of contraband control based on his experience in multiple prison facilities.  The initial question asked was whether dreadlocks could be searched by DOC personnel for contraband.  Aiken testified that " . . . you can use a metal wand, for example.  This metal wand would go over the hair to determine if there are metal products in the particular hair."  Trial Transcript, p. 58.  He also indicated:

> You can order the inmate to bend over with his hair down so that you can determine whether anything falls out of it.  You can do a hand evaluation of feeling particular braids, et cetera, to ensure no foreign objects are in there. And if further identification and review is required based on a trigger, that can be done, also.

Id.  A concern expressed by the DOC with searching dreadlocks is the amount of additional time this would take for DOC personnel.  Aiken indicated that he thought the amount of time would be "minuscule at best," and later stated that it would take "a minute or two maybe, maybe less than that" to search Ware's hair appropriately.  Id.

Ware was also questioned about his dreadlocks, and whether they should cause concern for bringing contraband into the prison.  Ware was specifically asked about how his hair might be effectively and efficiently searched.  He replied:

> For one, the wand.  For one, the hand wand that can detect metal objects and things of that nature.  Visually, the hair can be shaken out, physically patted down as a group and individually to see if anything is out of order that shouldn't feel a certain way.  Mainly those ways are pretty effective when it comes to that.

Id., p. 135.  Ware also demonstrated to the Court how he could put his head upside down, and believed that things that may be hidden in there would either fall out, or somebody could at that point squeeze and manipulate and take several seconds to ensure that there is nothing in there that shouldn't be there.  See id., pps. 135-136.  When questioned as to how long it has taken the guards in the past to search his dreadlocks, he replied "Oh, a minute.  Less than a minute at the most."  See id., p. 142.

One of the questions raised with contraband and dreadlocks is whether contraband can be hidden in the dreadlocks without detection.  Ware stated:

> First of all, you can't put anything inside of the dreads that I know of unless you have very, very big, thick - - it would have to be thick enough for something to actually go inside it because poking something into a dread would destroy it, for one.  It would tear it apart.  So I would have to have very, very thick dreads for anything to even be attempted to put inside of.

Id., p. 177.[2]  Of course it is Ware alone who chooses how thick, how long and how many dreadlocks he forms after each time he washes his hair.  While the precise number of hand-gathered and compressed dreadlocks was not elicited in testimony, the Court estimates that there were approximately sixteen (16) dreadlocks observed.

Seth Smith, Jr. ("Smith"), the Chief of Operations for the Louisiana DOC, provided additional testimony on the issue of contraband introduction.  Smith served as warden at Hunt prior to the promotion to his current title.  He agreed that a change in the grooming policy would affect the number of contraband incidents.  See Smith Video Deposition. Smith also addressed the concern that the time and manpower constraints would differ based on the custody level of the inmate.  Maximum security offenders would have to be shaken down more frequently, and staff would have to spend more time searching their cells. Ultimately though, Smith believes that minimum security prisoners would likely cause the most problems, as they spend more time outside and there are more of them. Additionally, anyone with contact visitors is more likely to get their hands on contraband.[3] See id.

Ware counters with the argument that the DOC permits pockets in some of their facilities, which arguably could be used to bring contraband into the facility.  Warden

---

[2]Ware's dreadlocks are not woven, instead they are formed on their own, with Ware keeping the pieces of hair separated so that they may form dreadlocks.  See Trial Transcript, p. 153.

[3]"Contraband" is defined as "any controlled dangerous substance as defined in R.S. 40:961 et seq., or any other drug or substance that if taken internally, whether separately or in combination with another drug or substance, produces or may produce a hypnotic effect; a dangerous weapon, or other instrumentality customarily used or intended for probable use as a dangerous weapon or to aid in an escape, unless authorized by the warden of the institution;  Explosives or combustibles, unless authorized by the warden of the institution." See La. R.S. 14:402(D)

Goodwin addressed this issue:  "The inmates that live in general population that have a lot of mobility, they wear blue jeans; and they report to school; they report to work assignments; they have activities going on.  They have to have a place to put things.  So, yeah, they need pockets."  Trial Transcript, p. 312.   There are a number of different work position assignments within any one DOC facility.  Warden Goodwin elaborated:

> There's probably no work positions that are lower risk.  There's inmates that have displayed less risk than other inmates, but they're all searched the same.  It doesn't matter if they work as my trusty in the A building that cleans my office, or if they - - or scrubbing toilets in the cellblock.  They are searched the same.

Id., p. 322.  Ultimately, the DOC has to make a judgment call as to whether a certain privilege is important enough to grant even though there is a risk of contraband being brought into the facility.  When asked if "the DOC will allow certain privileges that increase the opportunity for contraband to come into the system," he replied "yes, that's fair."  Id.

To ensure that contraband is not being brought into a DOC facility, all inmates who have been out on work assignment must be searched by DOC staff each time they return to the facility.  DOC makes the argument that the additional time it will take to search each prisoner wearing dreadlocks will place an undue additional burden on the DOC facilities and personnel.  Warden Goodwin testified about the current process for searching 150 individual inmates housed at David Wade Correctional Center:

> That takes a significant period of time to do the pat searches.  The walk through, they'll walk through the metal detector, so that doesn't delay.  But your actual pat searches, you have six or seven officers - - generally six officers, that's what's assigned to the work crew.  And you'll have those six officers performing the pat-down searches, and that's going - - you know, that's going to take you 45 minutes or so to do that crew.

Id., pp. 358-359.  Goodwin went on to testify that he thought permitting dreadlocks would

Case 5:14-cv-02214-SMH-MLH   Document 121   Filed 09/12/16   Page 14 of 24 PageID #:  3790

in fact increase the amount of time it would take to search a work crew as they came into the facility.  See id.  He further testified that the grooming policy has had an effect on the DOC's ability to effectively search hair.  See id., p. 374.  Goodwin was also questioned as to the need for a grooming policy when there are other places to hide contraband:

> Because it promotes a safe environment for our staff to work in; it promotes a safer environment for the offenders to live in; and, you know, it promotes - - it assists with overall stability of the institution.  Obviously, there is always going to be areas to hide contraband.  You certainly could not eliminate all of them.  But the haircut policy - - you know, it goes towards creating a better work environment, better living environment, and a safe environment for the public.

Id., p. 376.

A concern raised by Ray Anderson ("Chaplain Anderson"), the Chaplain at David Wade, was that the additional time for searches would negatively impact available time for religious programming.  He testified:

> And our programming runs so tight at Wade, with a skeletal crew of security, by the time that we would get the inmates counted, fed, and then through the various checkpoints, an additional 20 to 30 minutes would start getting into program timing.  Returning back through the gate is another 20 to 30 additional minutes on top of what already is required.

Id., p. 571.

Ware also contends that the DOC grooming policy is underinclusive when compared to the grooming policy for women in DOC custody.  Women inmates are permitted to grow their hair long, and even have braids, so long as the braids can be readily taken out for inspection.  The Fifth Circuit looked at this exact issue in Ali v. Stephens, 822 F.3d 776 (5th Cir. 2016).  The Court in Ali relied on the position of the Tenth Circuit, that "a government can rebut a claim that its policy is underinclusive 'by showing that it hasn't acted in a logically inconsistent way- by (say) identifying a qualitative or quantitative difference

between the particular religious exemption requested and other...exceptions already tolerated.'" Id. at 787, citing Yellowbear v. Lampert, 741 F. 3d 48, 61, (10th Cir. 2014).

Deputy Warden Connie Moore ("Deputy Warden Moore"), who has worked for over 25 years with both male and female inmates at Elayn Hunt Correctional Center and Louisiana Correctional Institute for Women,[4] provided ample testimony at trial on the issue of male versus female grooming policies.  She made clear that, based on her experience from working in prisons housing both male and female offenders, there are inherent differences between men and women, particularly with the way that they hide and introduce contraband into the prison facility.  See Trial Transcript, pps. 495, 511-512, 515.  During her trial testimony, Deputy Warden Moore confirmed that at her deposition she had testified that "hair is not a good place for women to hide contraband because, quote, they like to hide things where we can't see them."  Id., p. 472.  Deputy Warden Moore elaborated on the hiding places women prefer for contraband:

> They hide it under their dentures.  They hide it under their fat rolls.  They hide it under their breasts. They hide it in their vagina; that's their best favorite place because, of course, it takes us having to go to medical to get the object out.  Those are the main places that they prefer to hide things.

Id., p. 477.  Deputy Warden Moore explicitly stated, "And, I mean, unless you work with the women, the women are just different."  Id., p. 515.  When questioned by this Court as to whether in her experience women use their hair for the purpose of smuggling in contraband, Deputy Warden Moore replied, "No, they don't use - they haven't used their hair that I have been aware of."  Id., p. 518.

It is clear from the evidence provided by both Ware and the DOC that contraband

---

[4]Deputy Warden Moore testified that she had worked in the corrections system for "27 going on 28 years."  Trial Transcript, p. 508.

control is an extremely important aspect of internal prison security and management in both men's and women's prisons. There is no doubt that the DOC has a legitimate compelling government interest in preventing contraband from entering or being kept inside its prison facilities. The testimony establishes that controlling contraband is essential not only for the safety of the inmates but also for the staff of the prison facilities. Without question, this meets the requirements of a legitimate and compelling government interest.

Extensive testimony was provided by DOC officials with decades of prison management and administration experience as to the relationship between the introduction of contraband and the grooming policy.[5] It is not enough for this Court to merely defer to the expertise of the DOC. While Ware may argue that there are other less restrictive means by which the DOC can achieve its goal of controlling contraband than the current grooming policy, the extensive testimony during trial made clear that the proposed exception to the grooming policy for Ware would put an undue burden on the DOC. The additional time and staffing resources that would have to be dedicated to searching Ware and every other inmate wearing dreadlocks every time a search is conducted would consume significant additional time and impose a costly burden. That undue burden increases in severity with every other prisoner who wears dreadlocks.

This Court cannot merely defer to those who manage the DOC prisons with unquestioning deference, but it is within the discretion of this Court to consider the realities of the Louisiana DOC facilities. The testimony and evidence at trial made clear that there

---

[5]Warden Goodwin testified that he had been with the DOC "approximately 32 years." Trial Transcript, p. 302. Chaplain Anderson testified, "I'm in my nineteenth year" with the DOC. Id., p. 549. Deputy Warden Moore testified that she had "27 going on 28 years" experience. Id., p. 508.

have been significant budget cuts to DOC in recent years and that those cuts will worsen in the immediate future.  Additionally, as a result of budget cuts, the staff at these facilities is being adversely affected through staff layoffs and reductions due to budget cuts.  The individuals who are on the ground day-to-day in the DOC facilities have the best understanding of what policies and procedures are necessary to ensure that DOC facilities are able to achieve their intended mission.

The extensive trial testimony provided by individuals at all levels within the DOC system makes clear that the current grooming policy prohibiting dreadlocks is the least restrictive means of ensuring that contraband does not enter the facilities in light of the particular realities of DOC facilities.

### 4.        Offender Identification

The DOC has claimed offender identification as a compelling government interest making the grooming policy  necessary.  Ware was specifically questioned as to his beliefs about the DOC's interests in identification.  He replied, "I outlined a process that I believe personally would work for that, since part of the security issue is hair being long, hair being short, beard, your appearance being modified and whatnot."  Trial Transcript, p. 148.  He specifically stated:

> [T]he facility could take a picture with my hair tied to the back, with my beard in place, showing - - that would show a picture with my hair pulled to the back with a very low profile on my head itself with the beard in place.  Also, the same picture with my hair hanging to show - - to put my hair into the frame, so they could see it with the beard and with my hair showing.

Id., p. 149.

Secretary LeBlanc was also questioned on the issue of offender identification, particularly about offenders who have escaped trying to conceal their appearance.  He

replied:

> I think, when you talk about wigs and all the other things that go along with that, it's more - - it's harder for them to get access to that.  They have to expose themselves to buy a wig.  You know, with hair, it's fairly simple just to get your hair cut off, whether it's a pair of scissors or whatever.  I think the more difficult you make it, the better off you are as far as changing identity.

Id., p. 229.  Secretary LeBlanc was also asked about the current procedures for photo identification within the facility, and why the photos of Ware throughout his time incarcerated would not be sufficient for identification purposes.  He answered, "Well, if you use the first picture, and something happened to him right now and if you had to use the first picture, then that would be - - make it difficult.  I mean, it just - - to me, it doesn't look the same.  I mean, he looks different."  Id., p. 271.

Warden Goodwin spoke on the effect the grooming policy has had on prisoner identification:

> I mean, it helps in a lot of ways.  Not just the picture you take upon intake and the pictures you take at your annual assessments and things of that nature. But, you know, our turnover rate is fairly high among our security staff, our correctional officers.  At some of the institutions, it's even much higher than ours.  So I know they have the same issues that I deal with, maybe on a larger level. But we have about a 30 percent turnover in our security department on an annual basis.  So if you have a lot of new officers and a lot of new staff.  You know, every three weeks we're putting out a new group of employees that have finished the academy, and they're on the drop now.[6]

Id., p. 376.  He spoke specifically to the potential problem with offenders having long hair in that "[i]f you had several inmates with a long hairstyle, it would be very difficult to distinguish between those guys - - if you can't see their facial features. " Id., p. 377.

There is no question that being able to identify offenders and prevent inmates from

---

[6]"Drop" refers to the State of Louisiana's Deferred Retirement Option Plan under La. R.S. 11:3385.1.

escaping is a legitimate compelling interest of the DOC.  One of the most important duties of the prison facilities is ensuring that all offenders are accounted for, and being able to identify offenders is a critical element of that task.  The question then is whether this grooming policy is the least restrictive means to achieve this compelling interest.

Ware and the DOC have submitted the policies of a large number of the other 49 states and territories, and several of them address offender identification and the process for photographing inmates.  Ware argues that pictures can be taken showing what he looks like with dreadlocks and without dreadlocks such that the facility where he is housed will have no difficulty recognizing him.  The testimony of those that actually have experience within the prison facilities makes clear that the turnover of prison staff, along with the concern for escaped prisoners changing their appearances, makes the grooming policy the least restrictive means by which to achieve this legitimate compelling interest of the DOC.

### 5.    Offender Hygiene

On the issue of offender hygiene, Warden Goodwin testified about the intake grooming process, which includes:

> [T]he delousing shampoo and medicated shampoo and other things.  Once that's completed, everybody is, you know, examined by medical.  And, obviously, if you have, you know, really significant hair or whatever, you might have boils or MRSA on a sore on their head, staph infection or other things that's not detectible by - - you know, if it's covered by hair, the doctor or the healthcare provider that's providing the examination, may have a very difficult time noting these things, and it helps us with infectious control.

Id., p. 406.  When questioned, "And one of the reasons is that you felt that there might be concealed infectious diseases on somebody's scalp that the hair would cover up; right?" Warden Goodwin replied, "I mentioned that as part of the intake process, yeah."  Id.

Ware argues that the grooming policy is again underinclusive as to the female

inmates, stating that the same hygiene risks are posed to female inmates.  Deputy Warden Moore testified that female inmates are permitted to wear their hair in braids, however they must be able to take the braids out.  <u>See</u> Trial Transcript, p. 520.  The female inmates are not permitted to wear their hair in dreadlocks.  <u>See id.</u>  Again while Ware may argue that the policy is underinclusive, the hygiene concern is related to prison staff not being able to search the hair for infectious diseases.  Female prisoners must be able to take any hair style out so that their fingers can be run through their hair, permitting prison staff to view any infectious diseases on the scalp.  This is not the case with the dreadlocks hairstyle that Ware wants to wear.

The State has a strong interest in ensuring that the inmates remain hygienic while in custody, particularly when it comes to the potential spread of infectious diseases to inmates, staff and administrators.  This Court must look at the specific example of Ware and the dreadlocks style that he wants to wear and that this Court observed.  It is this Court's conclusion based on its own observation that there is no doubt that the dreadlocks style currently being worn by Ware makes it difficult to virtually impossible to detect any scalp conditions or infectious diseases of the scalp in general.  While Ware argues that the policy is underinclusive based on females not having to cut their hair, the female inmates are not permitted to have a hairstyle that they cannot "take out" to be inspected by prison facilities.

### 6.    Prisoner-on-Prisoner Violence

Aiken was questioned as to whether long hair puts an inmate at greater jeopardy for being hurt by other inmates pulling his hair.  His replied, "I don't recall within a correctional environment where the person's hair has been used against him to control him, et cetera,

either by staff or inmate population."  Trial Transcript, pp. 116-117.  Secretary LeBlanc testified differently, saying that he had seen inmates fight and "pull hair."  Id., p. 262.  When asked whether inmates with longer hair would be at a greater risk for injury he replied, "In my opinion, they would.  I mean, I just think it makes it easier for them to get ahold of them."  Id., p. 263.  He explicitly stated that the increased risk for physical injury is a reason why correctional officers are not allowed to have long hair.  See id.

Deputy Warden Moore also spoke on the differences between male and female inmates when it comes to prisoner on prisoner violence during her testimony.  She stated:

> Um, you know, like I said, just from being at Hunt, the offender-on-offender fights at the male institution were just a lot more severe than the female fights that they change their girlfriend and they, you know, they got made because she was talking to another girl, and went and slapped her.  I mean, it's just different.

Id., p. 504-505.  The Court asked Deputy Warden Moore, "When you describe the different kinds of inmate behavior between men and women and that, in your experience, the men-to-men fights have been far more severe, last longer, with more injury potential or actual injury than in women, has that been your experience through out your career?"  Moore answered, "Yes, sir."  Id., p.511.

It is imperative that prisoner on prisoner violence be kept to as much of a minimum as possible.  While in the custody of the DOC, inmates are the responsibility of the DOC, and that includes personal inmate safety.  The dreadlocks style currently worn by Ware could easily be used as a method to control him and inflict a more severe injury upon Ware during a fight between prisoners.  When asked whether he would ever cut his hair, Ware responded, "Not willingly, no, ma'am."  Id., p. 153.  He believed "that somewhere down the line, my hair is probably going to stop growing on its own."  Id.  It is unclear how long or

thick Ware's dreadlocks would be able to grow were he permitted to keep them, which would only make them more problematic as a means of controlling him and inflicting an injury upon him during a fight. He assumes that the length of his hair would stop naturally. There is no evidence that his hair would simply stop growing in length.

Other Jurisdictions[7]

Both Ware and Defendants submitted extensive evidence as to the grooming policies of other jurisdictions. After reviewing these varied policies it is clear to this Court that there is no one controlling policy by any one state when it comes to what is permissible grooming for inmates. The question then becomes what weight this Court must give to the policies of other jurisdictions. This Court looks to the analysis used by the Eleventh Circuit:

> That other jurisdictions choose to allow male inmates to wear long hair shows only that they have elected to absorb those risks. The RLUIPA does not force institutions to follow the practices of their less risk-averse neighbors, so long as they can prove that they have employed the least restrictive means of furthering the compelling interests that they have chosen to address.

Knight v. Thompson, 797 F.3d 934, 947 (11th Cir. 2015). In reviewing all of the evidence provided by all parties, it is clear that the grooming policies are unique to the individual states and the individual circumstances present in their prison facilities. Every jurisdiction must make decisions based on the particular set of circumstances they face within their own prison facilities.

The Supreme Court in Holt held that "[w]hen so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course." Holt, 135 S.Ct. at 865. Ware argues that a number of

---

[7]Ware's Motion for the Court to Take Judicial Notice of Additional State Policies and Procedures Relating to Inmate Grooming, Intake Haircuts, or Religious Exemptions (Record Document 97) is **GRANTED**.

states permit inmates to grow dreadlocks and/or have long hair, and therefore the DOC must offer persuasive reasons why it believes it must take a different course.  Based on the extensive testimony provided as to the specific and unique issues facing DOC prison facilities and prison management, including cuts to the DOC budget and staff, it is clear that the DOC facilities are not in a position to allow the requested accommodation, while also achieving the goals of inmate and employee safety, i.e., prisoner-on-prisoner violence.

## CONCLUSION

After reviewing all of the trial testimony and evidence, it is clear that the DOC has successfully and sufficiently proven by clear and convincing evidence[8] that the grooming policy is the least restrictive means of furthering the legitimate and compelling government interest in controlling contraband, identifying offenders, promoting offender hygiene, and preventing or at least minimizing prisoner-on-prisoner violence.  For these reasons, Ware cannot prevail and his Renewed Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction (Record Document 57) is **DENIED**.  Likewise, all claims set forth in Ware's complaint are **DISMISSED WITH PREJUDICE**.[9]

---

[8]RLUIPA itself is unclear as to whether the substantive burden of proof the DOC bears in demonstrating that the grooming policy is the least restrictive means of furthering a legitimate and compelling government interest is a preponderance of the evidence standard or a clear and convincing evidence standard.  See 42 U.S.C. §  § 2000cc-1, 2000cc-2 (allocating the "burden of persuasion" to the government without specifying the substantive burden of proof). However, consistent with Congress' intent that this statute be broadly construed in favor of protecting religious exercise, the Court has held the DOC to the clear and convincing evidence standard.  See 42 U.S.C. § 2000cc-3(g).

[9]Ware filed this lawsuit seeking injunctive relief against the DOC's "hair-cut policy."  Record Document 1 at 2.  He also sought a declaration that the DOC's grooming and intake policies as applied to him violate his rights under RLUIPA.  See id. at 5.

A Judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana this 12th day of September, 2016.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE